## TEXAS & P. RY. CO. v. AARON.  (No. 3709.)

Court of Civil Appeals of Texas.  Texarkana.
July 24, 1929.

Rehearing Denied Aug. 1, 1929.

rearrange the cars in what is called "station order." That process required a breaking up of the train and the switching of the cars onto one of the spur tracks. It was the appellee's duty to inspect the cars to be incorporated into the train while the switching operations were going on. He testified that a group of five cars to be inspected by him had been placed by the switch engine on track A5 several car lengths from the lead track, from which the cars were shunted. After that was done appellee went from another part of the yard to those cars on track A5 and began his work of inspection. While making a hose connection between two of the cars, three other cars in a bunch were kicked or shunted onto track A5, striking the cars which appellee was inspecting with unusual force and violence. As a result of the sudden and violent movement of the cars, he was injured.

The negligence alleged by the appellee, in his petition was the shunting of the cars with unusual force and violence onto track A5 while he was inspecting other cars standing thereon. The appellant pleaded assumed risk and contributory negligence. The case was submitted to a jury on a general charge, and a verdict was rendered in favor of the plaintiff for the sum of $20,000.

According to the evidence, about which there is no dispute, train 53, then being made up and inspected, was a fast freight, and because of the limited time it was to remain in the yards at Shreveport the work of inspection was usually done during the switching operations of making up the train. The proof also shows that it was the custom to kick cars onto track A5 while other cars standing thereon were being inspected, without giving notice to those doing the inspection. At the conclusion of the evidence the appellant requested a peremptory instruction in its favor. The refusal of the court to give that instruction is one of the errors assigned.

As the train of cars which the appellee was inspecting at the time of his injury was engaged in interstate commerce, the rights and liabilities of parties must be determined by the provisions of the Federal Employers' Liability Act (45 USCA §§ 51–59). As stated by counsel for appellant in their brief, it is well settled by the decisions of the federal courts, in passing upon controversies of this character, that the servant assumes the risks arising from the usual and customary way of conducting the master's business when he knows of that custom or is charged with such knowledge. Toledo, St. L. & W. R. R. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513; C. & O. Ry. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; G. M. & N. Ry. Co. v. Wells, 275 U. S. 455, 48 S. Ct. 151, 72 L. Ed. 370.

The request for the peremptory instruction was based upon the proposition that the evidence conclusively showed that at the time

Bibb & Caven, of Marshall, for appellant.

S. P. Jones and Franklin Jones, both of Marshall, for appellee.

HODGES, J. This appeal is from a judgment in favor of the appellee against the appellant for the sum of $20,000 as compensation for personal injuries. The injury occurred in the railway yards at Shreveport, La., on the night of August 24, 1927. The appellee was at the time employed by the appellant as a car inspector. The evidence shows that the railway yards at Shreveport were divided into three sections, known as A, B, and C. Each yard contained a number of spur tracks, on which cars were placed for convenience in making up trains. On the night of the injury, freight train No. 53 arrived at Shreveport and was due to leave some time later for points in the west. Before the train departed, it was necessary to

the plaintiff was injured the switching operations were being performed and the cars shunted onto track A5 in the usual and customary way of making up train 53, and that this custom was well known to the plaintiff in this suit. If the state of the evidence was as has been assumed in the above proposition, then clearly the peremptory instruction should have been given. But if the evidence warranted a finding that there was on that occasion a material departure from the usual and customary manner of kicking cars onto track A5 while the work of inspection was being performed, and that this departure from the usual custom rendered the situation of the inspector more dangerous, an issue arose which should have been submitted to the jury.

The material portions of the appellee's testimony upon that issue are as follows: Train 53 was a fast freight consisting of between 75 and 100 cars. It was to be broken up and the cars arranged in station order in the yard at Shreveport. That meant that cars destined for a particular station were to be bunched for convenience in handling at other stations along the route the train was to travel. In making up the train in station order, the cars were collected in bunches by the switching crew and pushed in on track A5. The appellee as inspector was required to do his work while those switching operations were going on. An hour and 45 minutes was allowed for inspection before the train was due to leave. After inspecting some cars in another part of the yard, appellee approached a group of 5 cars standing on track A5 and began his work of inspection, going toward the east end of the group. When he reached the coupling between the 2 last cars, he noticed that the air hose was disconnected. It was his duty as an inspector to make that connection. Before going between the cars for that purpose he looked to the west, the direction in which the switch engine was operating. "After I heard the engine down there," he testified, "I just stepped in between those cars and set my lantern down right under the coupling, and I picked up the air-hose next to me and stooped down to get the other one, but I never did get it. They hit me and knocked me about six or eight feet. The car to my right hit me. * * * It was in motion, but wasn't in motion when I went in there to do that work. I couldn't hardly say when I first noticed any movement of that car—the report and lick were all about the same time; that car was moved very quickly, and was moved at a very high speed. I was knocked some eight feet. When I hit the cross-tie on this hip this leg was on the track and I didn't have time to get out, and one wheel ran over it and I jerked it out and it was all cut off except two leaders, and that car continued to roll. I imagine they rolled about five car-lengths before they stopped; that would be about two hundred feet, I guess."

He also testified that after he was injured five cars rolled by him before they stopped. He estimated the speed at which the shunted cars were traveling at the time he was injured at about 12 or 15 miles per hour. The proof shows that a group of three cars had been kicked in on track A5, and it was their impact against the cars which the appellee was inspecting that caused his injury.

As to the custom of making up train 53 which prevailed at that time appellee testified as follows: "It was not usual or customary for cars to be shunted in against cars there on A5 while I was making up train 53 while I was still inspecting the cars. They usually pushed those cars in on A5 in making up 53; I had a bunch of cars already in there, and my duties required me to inspect those cars before the train was made up. With reference to the movement of other cars in there in the process of making up the train, the usual way of putting them in there was just by pushing them in there until they had to have more room on the lead, and if they need more room they would come in there with the switch engine with the bell ringing, and usually the switchman would ride the car from the engine and he would give them a slow signal, and on up to the time they get the cars all together; they would make as many separate moves as they had bunches. No, sir, it was not customary and usual to bring those cars in in such a way as to move the standing cars any distance. In making that coupling like that they would be moved something like two or three feet maybe." He further testified that it was the custom for cars to be kicked against those he was inspecting, without giving him any previous warning; that he was expected to look out for himself. But he also stated that he could take care of himself and avoid injury when the cars were shunted in the usual and customary manner which had prevailed in making up trains. He did not recall an impact prior to that time which had been made with so much violence that he could not take care of himself, even when in between the cars at the time they were struck.

The manner in which the cars were shunted on that occasion was a sharply contested issue. Appellant's witnesses testified that the cars were kicked onto track A5 in the usual and customary manner which had theretofore prevailed. There were various estimates made by those witnesses of the degree of force usually applied in the shunting of cars on to track A5 in making up train 53. All of them, however, estimated the force at much less than that to which the appellee testified was used at the time of his injury. Some of appellant's witnesses also stated that to shunt a bunch of cars with sufficient force to cause them to move five standing cars as

much as 200 feet was unusual and would result in serious injury to the cars. It thus appears that whether or not the usual custom of shunting cars was followed on that occasion resolved itself into a question of credibility of witnesses. That was an issue for the jury, and its finding must be respected on this appeal. The testimony of the appellee warranted the jury in concluding that the prevailing custom was not followed. The verdict therefore must be interpreted as a finding that his testimony was true and that the switching operations on that occasion were not conducted in the usual and customary manner; that the shunting of the cars which caused the injury was done with unusual violence, creating a situation more dangerous than that to which the inspector was usually exposed. The jury was warranted, therefore, in concluding, and evidently did conclude, that the shunting of the cars in the manner adopted on that occasion was negligence and created a risk which the appellee as an inspector did not assume. C., R. I. & P. Ry. Co. v. Ward, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430; Payne v. Connor (C. C. A.) 274 F. 497.

Several portions of the charge of the court are criticized by counsel for appellant. The provisions which are necessary to be considered in disposing of those assignments will be quoted:

"The evidence shows that the plaintiff was engaged in connecting the air hose between standing cars on track A5 on which train No. 53 was being made up, and that while so engaged cars set in motion by other servants of the defendant collided with those cars with sufficient force to cause the standing cars to move upon and injure the plaintiff. This, however, is not sufficient to authorize the plaintiff to recover against the defendant, but in order for the plaintiff to recover against the defendant you must find from a preponderance of the evidence that the defendant was guilty of negligence in causing the said moving cars to be handled in an unusual movement and to be negligently brought into collision with the standing cars which resulted in and caused the injury to the plaintiff; and, unless you so find, you will return a verdict in favor of the defendant.

"Again, if you find that the plaintiff was injured by a risk assumed by him, you will return a verdict in favor of the defendant. Again, if you find that the plaintiff's injuries were not received by reason of negligence of the defendant, but due solely to negligence of the plaintiff, you will find for the defendant.

"Now, if you shall find from a preponderance of the evidence that the agents or servants of the said defendant negligently kicked the said cars in an unusual manner at a high rate of speed and thereby negligently caused or permitted them to be brought into collision with the said standing cars at an un-usual and excessive rate of speed, and that the plaintiff's injuries were proximately caused by said negligence, then you will find in favor of the plaintiff, unless you find against him under other portions of this charge.

"The defendant was not an insurer of the safety of the plaintiff, and owed to him only the duty of exercising ordinary care to avoid inflicting injury upon him. If the defendant exercised ordinary care in the switching operations, then you will find in favor of the defendant.

"Again, you are instructed that if the cars were switched and handled in the usual and ordinary manner in which cars were switched and handled onto track No. A5 in making up train No. 53, you will find in favor of the defendant.

"Again, you are instructed that if the plaintiff was injured by a risk ordinarily incident to the employment in which he was engaged, you will find in favor of the defendant.

"You are instructed that if you believe from the evidence that it was usual and customary in making up train No. 53 to kick the cars in upon the track on which the train was being made up and against cars standing thereon, without any warning or signal that the same were being kicked in, and without any one riding upon the same to control them; and if you believe that the plaintiff knew, or in the exercise of ordinary care must have known, that such was the usual and customary way of making up such train, and that the plaintiff went between the cars of said train to perform some work and was injured by reason of cars being kicked in on said track in making up said train, then in that event you are instructed to return a verdict for the defendant.

"You are further instructed that if the plaintiff was guilty of negligence in going between the cars at the time and under the circumstances that he did, and that such negligence was the sole proximate cause of his injury, you will find for the defendant; or, if you find that the plaintiff was guilty of negligence in failing to keep a lookout and ascertain that the cars were about to move or were moving and would strike the cars which he went between, and that such negligence on the part of the plaintiff was the sole proximate cause of the injury to the plaintiff, you will find for the defendant.

"If you shall find in favor of the plaintiff, and you shall further find that the plaintiff was guilty of contributory negligence as that term has been defined to you in failing to keep a lookout to ascertain whether or not other cars were being kicked in on the track he was going upon, or in going between the cars and performing the work or attempting to perform the work which he did perform, or attempted to perform, and that such contributory negligence caused or contributed to cause the plaintiff's injury, then the damages that

the plaintiff has sustained should be diminished by you in proportion to the negligence attributable to the plaintiff."

The first paragraph above quoted is attacked as being upon the weight of the evidence. That part of the charge is merely a preliminary statement of facts about which there is no controversy in the evidence. The court is required to submit to the jury only those issues concerning which different conclusions might be reached. The objection is overruled.

There was no error in the manner of submitting the defense of contributory negligence. The court distinctly instructed the jury that if the plaintiff was negligent in either of the respects pleaded by the defendant, and that such negligence was the sole proximate cause of his injury, a verdict should be rendered for the defendant. It was not necessary to present those defenses in two separate paragraphs in order to give them the emphasis to which they were entitled.

The special charges requested upon that issue were properly refused, as the defense of contributory negligence was affirmatively and clearly presented in the charge given.

We are also of the opinion that the court's charge on assumed risk was a fair presentation of that issue, and is not subject to the objection that it was an insufficient and only a negative form of submitting that defense. It told the jury, in effect, and in language which could not be misinterpreted, that if the evidence showed that the switching operations on that occasion were conducted in the usual way, naming the methods which appellant's witnesses stated constituted the usual way, and that the plaintiff knew or in the exercise of ordinary care must have known that such was the usual and customary way of making up the train, he was not entitled to recover.

Complaint is also made of the refusal of the court to grant a new trial on account of the misconduct of the jury. The misconduct complained of is thus stated, in substance: (1) That some of the jurors while in the jury room discussed the attorney's fees that might have to be paid by the plaintiff; and (2) that while deliberating some of the jurors stated that the defendant had already made an offer to the plaintiff of $4,500, together with a job during his lifetime, as a compromise and settlement of his claim. The following is the testimony heard by the court in passing upon the motion for a new trial:

The juror Geo. C. Wallover testified, in substance, that when the first ballot was taken he voted for a verdict of $10,000, while others voted for $20,000 and more. While in the jury room, and during their deliberations, the remark was made that the attorneys for the plaintiff were to get half of the amount which the jurors might give the plaintiff as a verdict. When called upon to name the man who made that remark, he stated that his name

was Doyle. The subject of attorneys' fees was not mentioned over three times, but was mentioned by as many as two different jurors. He also stated that something was said in the jury room about the railroad company having offered the plaintiff a settlement of $4,500 and a job for the rest of his life. He could not say positively which one of the jurors it was who said that. He could not say that more than one juror mentioned that subject. He held out for $10,000 for some time, and finally agreed to a verdict of $20,000. He further stated that the offer of settlement of $4,500 and a job for life did not have any influence in inducing him to change his verdict from $10,000 to $20,000, but that the discussion of the attorneys' fees did have some influence over him. On cross-examination he stated that the matter of attorneys' fees was mentioned shortly after they went into the jury room. A man whose name he understood was Doyle was the man who mentioned it. The subject was mentioned twice after that, making three times in all. He was not sure who the other two were who mentioned it. On being recalled, he further testified that three of the jurors, whose names were Greenie, Beall, and Fitzgerald, went with him over to the window and there discussed the subject of attorneys' fees.

Eleven other jurors were called and testified. All of them stated that they never heard the subject of settlement or compromise mentioned in the jury room.

Doyle testified that he did not mention attorneys' fees while in the jury room, and did not hear the subject mentioned. On cross-examination he testified that something was said about the attorneys getting a part of what was awarded to the plaintiff, when somebody said, " 'That's none of our business,' and I said, 'No, it is not.' " He did not hear the subject mentioned any more. All he remembered was that the man said the attorneys would get part of it; he guessed, and the foreman stopped it right then.

Hartzo, the foreman, testified that on the first ballot five of the jurors were for $25,000, six for $20,000, and one for $10,000. The first thing they did after retiring was to read the charge of the court. They recalled that the court in his charge instructed them not to discuss the matter of attorneys' fees. The low man was Mr. Wallover. Soon after the charge was read, somebody said, " 'What about the attorneys' fees?' and I said, 'We can't discuss anything only the testimony in the case, according to the judge's rule;' and that was all that was said about the attorneys' fees, except that Mr. Greenie spoke up about the time I did and made the remark that we couldn't discuss any attorneys' fees, and I didn't hear it mentioned after that." On the second ballot eleven of the jurors stood for $20,000, and one man for $15,000, the latter finally coming to $20,000. He did not re-

member who the man was who mentioned the matter of attorneys' fees.

Watson testified that he heard no mention of attorneys' fees.

Tankersley testified that some juror said something about attorneys' fees and the foreman promptly stopped it, "told them to leave that off, or something," and that was the end of it so far as he knew.

Beall testified that a short time after they went into the jury room some one mentioned attorneys' fees, and the foreman promptly stopped it. He and Wallover and Greenie and Fitzgerald did not go over to the window and discuss the subject of attorneys' fees. The remark about attorneys' fees was that Mr. Aaron, the plaintiff, would have to pay his attorneys out of what he got.

Greenie testified that he heard the subject of attorneys' fees mentioned one time, right after they went out. He and Hartzo both spoke up at once and told the party not to mention it.

Hankins testified that some one said something about attorneys' fees, and Hartzo promptly stopped him.

Ragland testified some one said something about attorneys' fees and the foreman called him down. No more mention was made of it. The man who said it just started to say something about attorneys' fees, and the foreman called him down; he could not have spoken over three or four words.

Summers testified that some one said, "Do you reckon the attorneys will get any part of the fees?" and the foreman stopped him.

Aiken testified that he was reading a newspaper, and did not hear any juror mention attorneys' fees, except what the foreman said against a discussion of that subject.

Fitzgerald testified that some man did say, "Won't his attorneys get half?" and the foreman stopped him right then, and the subject was not mentioned any more. He thought the man who mentioned attorneys' fees was Wallover himself. He denied going over to the window with Wallover and other jurors and discussing the subject of attorneys' fees. On cross-examination he was not sure that Wallover was the man, but his testimony indicates that he thought the remark concerning attorneys' fees was made by Wallover, and no other party.

From the foregoing the court was warranted in drawing the following conclusions: (1) That the subject of an offer of a settlement by the railway company was not mentioned during the deliberations of the jury. (2) That the subject of attorneys' fees was mentioned once, but discussion of the subject was promptly suppressed by an admonition from the foreman, who reminded the jurors that the court had specifically instructed them not to consider the matter of attorneys' fees.

Wallover testified that he heard the offer of settlement mentioned. Eleven other jurors testified that they did not hear it mentioned during their deliberations. Between the testimony of Wallover and those eleven there is an irreconcilable conflict which the court had a right to determine, as he apparently did, by finding that the subject was not mentioned.

There is also a similar conflict between the testimony of Wallover and the other eleven jurors as to a discussion of the subject of attorneys' fees. Wallover testified that he heard three other jurors mention that subject. Each one of those three denied having mentioned it. The entire eleven jurors testified that they heard the subject of attorneys' fees mentioned one time, but that discussion was promptly suppressed by an admonition from the foreman. If the testimony of the eleven be true, Wallover alone was the man who mentioned that subject. One juror testified that he was under the impression that Wallover was the man. While the other eleven did not specifically say that they did not mention the subject, that was the only legitimate inference to be drawn from their testimony. The court was the judge of the credibility of the witnesses who testified in that hearing, just as the jury was the judge of the credibility of the witnesses who testified in the trial of the case. The court was authorized to conclude that Wallover alone mentioned the subject of attorneys' fees and that further discussion was promptly stopped by the foreman. Wallover further testified that he was influenced by the mention of that subject. In other words, he stated, in effect, that he took into consideration the fact that the plaintiff in the suit would have to pay the attorneys a part of what he recovered, and for that reason he agreed to the verdict of $20,000. That statement may be true; but did that fact require the court to set aside the verdict and grant a new trial? We think not. According to the testimony which the court was authorized to accept as true, the subject of attorneys' fees was not discussed by any two or more jurors during their deliberations. It was merely mentioned once, and then by the very man who says he took that matter into consideration in agreeing to the verdict. The statement of Wallover means no more than that he was influenced by a process of reasoning which originated in his own mind, and not by any suggestion from any other juror.

The courts cannot undertake to probe the minds of jurors or to supervise their process of reasoning during their deliberations. All that the courts are expected to do is to exclude from the jurors the evidence of facts which they should not consider. If a juror of his own accord takes into consideration an improper fact and is thus led to agree to a verdict different from what he would otherwise have agreed to, that is merely following his own method of reasoning, a process over which no court can exercise a supervisory power.

There was, according to testimony which the court was authorized to accept as true, no overt act occurring in the jury room which might properly be termed "misconduct" within the meaning of the statute which allows an inquiry into the proceedings of the jury during their deliberations.

The judgment is therefore affirmed.