**EDENS–BIRCH LUMBER CO. v. WOOD.**
No. 3636.

Court of Civil Appeals of Texas. Beaumont.
April 5, 1940.

Rehearing Denied April 10, 1940.

Manry & Cochran, of Livingston, Pitts & Liles, of Conroe, and Battaile & Burr, of Houston, for appellant.

A. A. Turner, of Conroe, and Fulbright, Crooker & Freeman, of Houston, for appellee.

O'QUINN, Justice.

L. B. Wood, for himself and as next friend for Martha Wood, his minor daughter, sued appellant, Edens-Birch Lumber Company, a Texas corporation, to recover damages for injuries alleged to have been sustained by Martha Wood in a collision between the automobile in which she was riding and a lumber truck of appellant, which it was alleged was negligently left standing on the paved portion of the highway, in the night time without lights, by reason of which the collision occurred, resulting in the damages alleged.

The case was tried to a jury upon special issues, upon their answers to which judgment was rendered in favor of appellee, L. B. Wood, as next friend of Martha Wood, the minor, in the sum of $18,000, and in favor of L. B. Wood, individually, for $1,719. This appeal is from that judgment.

Appellant's brief contains nine assignments of error upon which it bases five propositions. The first, second, third and fourth are presented together. They, in effect, are: (a) That there was no evidence of reasonable present cash value of such doctor's service and hospital expenses as Martha Wood will, in reasonable probability, have to incur in the future (after she becomes of age) as a proximate result of her injuries, wherefore the court erred in submitting special issue No. II which authorized the jury to consider as an element of damage "the reasonable present cash value, if any, of such doctor's service, if any, and hospital expenses, if any, which Martha Wood will in reasonable probability incur after she becomes 21 years of age as a proximate result of her injuries, if any," over its objection that there was no evidence upon which the jury could base a finding of such damage; (b) that the evidence was insufficient to support a finding by the jury of such damage as submitted in special issue No. II; (c) that there was no evidence of probative force upon which the jury could estimate the reasonable present cash value of such doctor's services and hospital expenses, if any, which Martha Wood would in reasonable probability incur for such services in the future as a proximate result of the injuries she had received, and the submission of special issue No. II erroneously permitted the jury to speculate and guess in determining the value of such future services; and (d) that the pleading of appellee was not sufficient to support a finding on such issue.

These assignments are overruled. The pleadings and the undisputed evidence show that the lumber truck of appellant was between 1 and 2 o'clock a. m. on January 24, 1939, travelling along the public highway leading from Houston, Texas, to Lufkin, Texas, going north, that is, toward Lufkin, and at the same time Martha Wood, with three other persons, were in an automobile travelling on and over the same highway and in the same direction. They were be-

hind the truck, but neither the driver of the truck nor the persons in the automobile were aware of the position of the other, that is, neither had knowledge of the other until the collision occurred. The night was dark and somewhat cloudy—it had been raining—and there was considerable fog which was in layers or spots, the lower edge of the fog being about head high from the ground. At the time of the collision the truck was stopped on the highway, and the automobile struck the rear end of the trailer attached to the rear of the truck. There were no lights on the truck or trailer either front or rear. The headlights of the automobile were burning. The driver of the automobile testified that he did not—could not—discover the presence of the truck until he was within some 20 to 25 feet, when he instantly put on the brakes and attempted to steer to the left, but could not avoid striking the truck which was standing in the right lane of the road. The truck was dark in color and the dark night and the lowering fog prevented him from sooner discovering the truck. The automobile was going about thirty miles per hour. The driver of the truck testified that he was driving at about twenty-five mile per hour when the truck suddenly went "dead all at once"; that the lights went off and the truck stopped; that he had been making about thirty-five miles just before. The back end of the trailer of the truck slid over the hood of the automobile and crashed through the windshield, and struck Miss Wood in the face, inflicting the injuries plead. Some 15 acts of negligence on the part of appellant and its agent and servant in operating the truck on the highway were alleged, and each alleged to be a proximate cause of the collision and injury to Miss Wood.

Appellee further alleged:

"V. That as a direct and proximate result of the negligence of the defendant, its agent, servant and employee, the minor plaintiff Martha Wood was severely injured and damaged. That said automobile in which she was traveling struck the rear end of said truck and semi-trailer and the bed of said semi-trailer struck or shoved through, against and into the top or body of said automobile and the minor plaintiff was struck thereby and was thrown in and against the various parts of said automobile, which severely injured her. The said minor plaintiff was struck on the head and face, chest, arms, hands, shoulders, body and on her limbs. She was bruised from her head to her feet over her body; her muscles, bones, tendons and ligaments, nerves and blood vessels were bruised, strained, stretched, cut and torn; that her skull was fractured and the bones of her face and head, nose and ears crushed, broken and fractured and displaced and will continue to be the balance of her life; that the muscles, nerves and blood vessels of her face, head and neck were bruised, cut, torn and severed, and the same became infected, inflamed and swollen and her face is now and will be in the future unsightly and permanently scarred. Said minor plaintiff was knocked unconscious and one of her eyes was so injured and damaged that it had to be removed entirely. That the bones of her jaws were broken and fractured and some of her teeth knocked out and some of them had to be removed as a result of her injury. On account of said injuries, said minor plaintiff lost an extreme amount of blood and was very critically sick.

"Immediately after said minor plaintiff was injured she received first aid treatment and was brought to Houston, Texas, where she was confined in St. Joseph's Infirmary for treatment. On account of said injuries to Plaintiff's face, head and ears her said face and head became inflamed and swollen and infected and she had a severe fever, and the same continues to be so and will in the future be so; that the bony fragments of her face failed to heal and unite and the same never will heal and unite, and came out through the flesh and muscles; that since the removal of her eye her face is unsightly and shows a severe scar, which condition is permanent. That said minor plaintiff was confined to St. Joseph's Hospital for 52 days and it was necessary to perform several operations upon her face in order to straighten the bones thereof and her jaws and teeth, and remove fragments of bones, and it will be necessary for other and additional such operations in the future to be performed; that she has been constantly under the care and attention of physicians since said injury, and she will require such attention in the future from time to time. That from the time of said injury down to the present said minor plaintiff has suffered most excruciating physical pain and she will continue to suffer the same during the remainder of her life; that she will require the services and attention of a doctor from

*time to time to treat said injuries during the remainder of her life;* that plaintiff has suffered extreme mental anguish and will continue to suffer mental anguish during the remainder of her life; that plaintiffs have obligated themselves to pay the sum of $353.00 for nursing services; the sum of $300.00 for medicine; the sum of $30.00 for ambulance to be brought from Cleveland, Texas, to Houston, Texas, the sum of $319.80 for hospitalization, including the use of an operating room, anaesthetics, et cetera, and the sum of $3,500.00 for doctors' services; *that each and all of said expenses were necessary for her proper care, treatment and attention, and the charges made therefor were the usual and customary charges* in Houston, Harris County, Texas, where the same were rendered. That prior to her said injury, the minor plaintiff was a healthy and strong young girl, twenty years of age, and able to work and do the usual and ordinary things that a healthy, strong young girl cared to do. That she worked as a waitress and earned from ten to twenty dollars per week which was sufficient to support and maintain herself. That plaintiff L. B. Wood was entitled to her earnings from the time of her injury to the time she becomes twenty-one years of age. That such earnings would have been approximately $1,000.00 per year, and he has become responsible for the medical and hospital and doctors' expenses which have been incurred as herein alleged and the *minor plaintiff, Martha Wood, after attaining her majority will be required to provide and pay for her medical, doctors' and hospital expense in the future, which he alleges to be $3,500.00.* That said minor plaintiff is not now and will never be able to work again. That she is permanently disfigured and injured and will be dependent upon her father for support and maintenance, care and attention in the future. That on account of said injury said minor plaintiff has been damaged in the total sum of $65,000.00."

This pleading discloses ample allegations of necessity in the future for medical treatment and hospital care, and alleges that same will cost her the sum of $3,500. No special exceptions were levelled against appellee's petition, neither as to the sufficiency of any matter alleged, nor as to the lack of particularity. But it is insisted that the pleading (above set out with those portions italicised which relate to the necessity of future medical treatment, and hospital services) will not support a recovery for such future damages, and so were insufficient for the submission of special issue No. II, which reads:

"Special Issue No. II. What sum of money, if any if paid now in cash do you find from a preponderance of the evidence will reasonably compensate Martha Wood suing herein by and through her father, L. B. Wood, as her next friend, for the personal injuries, if any, sustained by her as a proximate result of the collision between the automobile in which she was traveling upon the occasion in question, and the defendant's truck taking into consideration the following elements of damage and none other:

"(1) Such physical pain, if any, and mental suffering, if any, as the said Martha Wood has sustained in the past and up until the trial of this cause as a proximate result of her injuries, if any,

"(2) Such physical pain, if any, and mental suffering, if any, as the said Martha Wood will in reasonable probability experience in the future beyond the date of this trial, as a proximate result of her injuries, if any,

"(3) The reasonable present cash value, if any, of the loss, if any, of Martha Wood's capacity to labor and earn money after she becomes 21 years of age which she will in reasonable probability sustain as a proximate result of her injuries, if any,

"(4) The reasonable present cash value, if any, of such doctor's service, if any, and hospital expenses, if any, which Martha Wood will in reasonable probability incur after she becomes 21 years of age as a proximate result of her injuries, if any,

"Answer by stating the amount in dollars and cents, if any."

Appellant objected to the submission of this issue as follows:

"12. The defendant specially objects and excepts to Special Issue No. Eleven, * * * because there is no evidence before the jury by which they might determine the reasonable doctor's services and hospital expenses which she might incur in the future, and such issue leaves the jury free to speculate as to what sums, if any, plaintiff may spend in the future for doctor's services and hospital expenses, and, therefore, there is no basis from the evidence by which a jury could determine such sum, if any."

"19. Defendant further objects and excepts to subparagraph four of Special Issue No. Eleven, wherein the Court submits as an element of damage the reasonable present cash value, if any, of such doctor's services, if any, and hospital expenses, if any, which Martha Wood will, in reasonable probability, incur after she becomes twenty-one years of age as a proximate result of her injuries, if any;

"(a) Because there is no evidence upon which the jury can base a finding of such reasonable present cash value.

"(b) Because there is insufficient evidence to support a finding by the jury of any given sum of money representing such reasonable present cash value.

"(c) Because the absence of any evidence of probative force upon which or from which the jury can estimate such reasonable present cash value permits the jury to indulge in speculation and mere guess work in fixing and determining said submitted item of damage.

"(d) The said item of damage finds no support in the pleadings."

While appellant in its brief admits that the evidence shows that Martha Wood will have to have medical attention in the future, still it says that the evidence fails to show "what character of treatment will probably be required, what the reasonable cost of such treatment would be for any given treatment or course of treatments, or how long such treatments will probably be necessary"—that the amount and value of the doctor's services and hospitalization that she may require as a proximate result of her injuries are left entirely to speculation and conjecture.

We think this contention is without merit. In brief, Miss Wood testified that among the injuries she received in the collision, were: a broken and crushed nose, both cheek bones crushed in, right jaw bone broken and left jaw bone knocked out of place, one eye so badly injured that it had to be removed, her skull was fractured in several places, that she was hit all over her face and the bones crushed, her face became so swollen and inflamed that she felt the skin was going to burst, three operations have been performed on her face since the accident, that three weeks just prior to the trial she suffered an operation for infection of one of her ears, that the bone of the ear was chiselled, and at that time (three weeks before the trial of the case) she was sick and had 103 degrees of fever; that on Saturday the doctors opened a place in her face and on Monday they had to go back and reopen it and put in a drainage tube to release pus; that her eye had not healed where the ball was removed and she had infection in it then (when she testified); that the bones over her injured eye were crushed; that she still gets pieces of broken glass out of cuts in her face; that for three weeks after the accident while she was in the hospital, she was wholly unconscious.

Dr. Peterson, a brain specialist and skull surgeon, testified that Martha Wood was brought into the hospital in the early morning of January 24th, and was then in "extremis"—a very desperate condition—practically dead; that she was suffering from superficial lacerations of her face, lip, nose, and that her right eye—the cornea —shiny part of the eyeball, had been cut and was protruding—that the iris was extruding and the lens dislocated—her pulse could not be felt; that her condition was so desperate that she had to be sent to the ward without X-ray examination; that she was given food in the veins until she had, in a measure, recovered from shock, and that after she was in a condition to be tested by X-ray she was taken to the X-ray room and there examined; that she had skull fractures, one over the eye extending into the base of the skull, another across the base of the nose, that both cheek bones were fractured and driven in on each side and underneath the cheek bones in the sinuses, a broken mandible and a fracture at the base of the skull, that her face and head were swollen beyond recognition, that her temperature varied between 103 and 104, and one time reached 106 and her pulse rose to 150.

He further testified that from the time of the accident she had been in the hospital for treatment three times; that the second time was because of a large abscess which had formed in the left cheek just in front of the ear, which had to be opened and drained; that shortly thereafter she developed and *now* has a small opening just to the right of her nose, and through that opening she expels every two or three days a small amount of pus, which, he said, disturbed the doctors very much because they felt that they were obviously dealing with a bone infection; that the third time she was in the hospital the sinus tract was opened and the bone scraped, but that

this had not cured the situation, because she still drains pus from the opening, and that, in the doctor's estimation, was a very serious complication, perhaps the most serious complication, because it meant an infection in the bone, and with the bones in her face so broken, it will probably go into a chronic infection of the bone, known as *osteomyelitis;* that ordinarily a bone infection of the hip or leg are not of serious concern to the doctor, because, as a rule, no other complications arise, but in a bone infection in the face there is always a great risk of a brain abscess, because the drainage is back to the roof of the nose and the roof of the mouth, which makes it a very serious situation.

He further testified that three weeks before the trial of the case she was in the hospital for inspection of the mumps gland, which had to be incised and drained, and that she then complained of great pain and had to be administered a sedative; that she had not recovered from her injuries, and that she would have to have medical treatment for her injuries *in the future.* In answer to a question as to how long she probably would require treatment, he said "That is very problematical. That depends on how this sinus tract clears up. She still has some pus coming from her eye, so much so that we have not been able to get an artificial eye that will satisfactorily do the work, an eye that will simulate in appearance what the other eye does." That the most important thing that was bothering her at that time was the small facial tract that goes back to some dead bone at the side of the nose in the maxilla, the cheek bone; that he had tried to remove some of the bone in the maxilla on the right side of the base of the nose; that the usual practice in treating such a condition was to pack it and wait for the dead bone to separate, and then remove it; that this infection set up about six weeks after the accident—that it was a sort of osteomyelitis; that it was a little better now, but that it was not his prognosis that *she would ever get over it;* that usually they speak of these as chronic osteomyelitis; that the history of these things is that it will become infected and the doctor will operate on it half a dozen times and still they persist; that it had never cleared up, though they scraped the bone, and it appeared better, but not cured; that once one

had chronic osteomyelitis he has it a long time. .

He further testified that he could not estimate what would be the reasonable charges for such medical attention as she would require in the future. He was asked: "Are you able to estimate what would be the reasonable charges for such medical attention as she will probably require in the future after this time?" To which he answered: "No, sir. *You can't estimate that very well, but she is going to require medical treatment in my estimation for a long time, she may need it the rest of her life and she may need it a lot less, but chronic osteomyelitis is a chronic disease."*

Evidence of the cost of medical treatment and hospitalization up to the time of the trial showed to be near two thousand dollars. This was shown to be proper and reasonable.

As before stated, appellant in its brief admits that future treatment will be necessary, and we do not find any evidence in the record challenging the nature of such treatment, nor the reasonable cost as indicated by the nature of the required services and their cost prior to the trial. The contention is that the pleadings as to the necessity and cost of future medical services are insufficient to support a judgment for such damages, and that there is no evidence of the reasonable present cash value of such services.

The record without dispute shows that the injured girl will have to have medical treatment and in all probability hospitalization for a long time as the direct result of her injuries. It is also without dispute that it was impossible to estimate the exact amount of medical attention she will require in the future, and so impossible to estimate the reasonable cash value of such services. There was, however, before the jury ample evidence to show the *nature and value of the services which had been rendered her in the past;* and certainly, we think, it plainly shows that she will need the same kind of services in the future. As to damages of this nature, the jury should be allowed upon the knowledge they have acquired from the testimony as to the reasonable value of services *already rendered,* to make some estimate of the damages as to services which will be required in the future.

Appellant, at least by inference, contends that appellee should have had some doctor estimate the damages for future treatment, thus, in effect, asserting that there was no other method by which the jury could have arrived at the amount of such damages. Appellee alleged the need for future services and its costs. He disclosed in minute details the physical condition of the injured girl on the very day of the trial; showed the medical and hospital treatment she had received prior to the trial, and the reasonable value of same, and the progress toward recovery she had made under such treatment. Certainly no doctor could have done more than give his opinion or estimate of her medical requirements in the future. Upon what could he have based his estimate? The only possible answer to that is, the nature and extent of her injuries, and the progress toward recovery she had made under the treatment she had received. The jury had the right to take the nature and extent of her injuries and her progress toward recovery under the treatment she had received, and the reasonable cost of her medical and hospital treatment in the past, her physical condition at the time of the trial, and estimate the necessity for medical and hospital treatment in the future, and the reasonable value of such future medical treatment and hospital expenses.

As to the sufficiency of appellee's allegation of the necessity and cost of future damages we need go no farther than to consider the holding of the Supreme Court in Dickey v. Phœbe Jackson, Tex. Com.App., 1 S.W.2d 577, cited by appellant. There, the court says, "Miss Jackson averred that 'as a result of the injuries aforesaid and in her attempt to alleviate the damages caused thereby,' she has been 'compelled to employ skillful medical attention and skin experts, and will in the future' (be compelled to do so), 'and will become liable to pay for said medicine and medical treatment the sum of $1,500.'" In passing upon the sufficiency of this allegation, the court said: "If it be true that she will, as alleged, 'become liable' in the sum mentioned, it is so, inter alia, because the medicines and services will reasonably have that value * * *. Her allegation is largely that of mere conclusion, and from its terms the essential reasonableness of those expenses must be deduced; yet, absent special exception duly presented and overruled, the pleading must be held

sufficient to present the matter of those items of damage." Citing Texas & P. R. Co. v. Lee, 21 Tex.Civ.App. 174, 51 S. W. 351, 57 S.W. 573, writ refused. The allegation in the Phœbe Jackson case as to the question of future damages was certainly a more general allegation than in the instant case, and here there was no special exception to the allegation.

In 17 C.J. 805, it is said: "The jury may, in assessing damages, consider the circumstance that in the future plaintiff will be subjected to expenses for doctor's bills, nursing and attendance; and if the condition of the person is such that further outlays for medical or surgical treatment or nursing and attendance will be required, they may give damages for such prospective expenses. There must, of course, be evidence in the case as to the probable necessity of such expense."

And in 17 C.J. 917 (Damages Future Expenses): "It has been held that, where there is no evidence as to the probable extent of such services or as to the amount which might have to be expended therefor, *the jury may determine from the services which at that time have been required and the value thereof what might be reasonably expected in the future.*" (Italics ours.)

In 13 Tex.Jur. 78, the rule is stated: "The elements of injury for which damages compensatory may be given vary in their character. To some of these the means for ascertaining the compensation which ought to be given is such that it may be fixed with almost mathematical certainty, while as to others this degree of certainty cannot be reached. At some periods the tendency has been to restrict the recovery of damages to such matters as are susceptible of having attached to them an exact pecuniary value—e. g., the dollars and cents lost as the result of a breach of contract or tort. At the present time, however, the fact that it may be found difficult to ascertain the exact amount of compensation which ought to be made for an injury is not considered as a sufficient reason why compensation should not be given. This is true as to the loss or damage occasioned by personal injuries or wrongful death.

"*The rule forbidding the recovery of damages which are uncertain or contingent does not apply where the amount, measure or extent of loss or injury is uncertain; it 'only applies to such damages*

as are not the certain result of the breach, and not to such as are the certain result, but uncertain in amount.' And, while the amount or extent of loss or damage must be shown with a reasonable degree of certainty, reasonable certainty is all that is required; the loss or damage need not be shown with mathematical exactness. The amount may be fixed by the jury in the exercise of a sound discretion under proper instructions from the court. *Nor, in a case where the damages are incapable of exact ascertainment, is it necessary to place a money estimate on the amount of loss or injury; the jury are allowed to use their own judgment and discretion. Consequently, where it is shown that the defendant's act has occasioned damage to the plaintiff, and the only uncertainty is as to the amount, there can rarely be good reason for refusing, on account of uncertainty, any recovery whatever for the breach.*" (Italics ours.)

And in 17 C.J. page 756: "The rule against the recovery of uncertain damages generally has been directed against uncertainty as to cause rather than uncertainty as to measure or extent. In other words, the rule against uncertain or contingent damages applies only to such damages as are not the certain results of the breach, and not to such as are the certain results but uncertain in amount. *In many cases, although substantial damages are established, their amount is, in so far as susceptible of pecuniary admeasurement, either entirely uncertain or extremely difficult of ascertainment; in such cases plaintiff is not denied all right of recovery, and the amount is fixed by the jury in the exercise of a sound discretion under proper instructions from the court. This is particularly true of torts, especially those resulting in personal injuries;* but even in the case of contracts a party who has broken his contract will not ordinarily be permitted to escape liability because of the uncertainty in the amount of damage resulting and the fact that the full extent of the damages for the breach must be a matter of speculation is not a ground for refusing all damages. *So in cases of tort, where there are elements of certainty as to a part only of the damages which have resulted, leaving it apparent that there are actual damages beyond what can be thus accurately measured, plain-*

*tiff's recovery is not limited to so much only as can be measured with certainty.*" (Italics ours.)

In Scurlock v. City of Boone, 142 Iowa 684, 121 N.W. 369, 371 (by the Supreme Court of Iowa), it is said: "As we have heretofore said, the plaintiff's wife was seriously injured by the accident in question. She was confined to her bed for some time, and it became necessary to have the attendance of physicians, and she needed and received nursing and care and attendance from the members of her immediate family and from near relatives. The evidence showed the value of the medical attendance which had been rendered her and showed nursing and care and attendance which she had received from the members of her family and relatives, but there was no evidence as to the value of such nursing and attendance. The court instructed that the plaintiff would be entitled to recover 'such reasonable amounts, not exceeding the amount claimed in the petition, as will compensate him for damages suffered by reason of expenses incurred for medical service' for his wife, damage for furnishing nursing for her and such damages, 'if any, as it is reasonably certain he will incur in the future for medical services on account of said injuries.' The complaint of this instruction is based on the grounds that there was no evidence as to the value of the nursing, and *no evidence as to the value of future medical attendance.* The evidence showed that the condition of Mrs. Scurlock's health at the time of the trial was such as to warrant the jury in finding that medical services for the injuries would be required in the future; and, *while there was no evidence as to the probable extent of such services or as to the amount which might have to be expended therefor, the jury might determine from the services which at that time had been required and the value thereof what might reasonably be expected in the future.*" (Italics ours.)

The Supreme Court of Missouri, in Stoebier v. St. Louis Transit Co., 203 Mo. 702, 102 S.W. 651, 654, in passing upon the question here involved said: "The third objection lodged against this instruction is that it permits the jury to include in its verdict expenditures which might be necessary for plaintiff to incur in the future on account of her injuries, when there was no evidence to show that

they would be necessary, *or what they would be reasonably worth.* We are also of the opinion that this objection is without merit, because at the trial the evidence showed that plaintiff had three physicians and one or two of them testified that she was then still under their charge, and was a helpless, a suffering paralytic, and would never improve, but would continually grow worse. If that condition of her health does not tend to show she will need medical attention in the future, we are unable to conceive a case where such attention would be necessary. * * * *As to what attention she will require during her life and its probable value are matters of more or less speculation. No one can tell how long she will live, what her suffering will be, or what amount of medical attention she will require. The jurors are as capable of judging of those matters as any one else could be.* See Curtis v. McNair, 173 Mo. [270] 271, 73 S.W. 167." (Italics ours.)

Appellant apparently depends mainly upon the case of Dickey v. Phoebe Jackson, Tex.Com.App., 1 S.W.2d 577, for support of its contention. We think that case can be materially differentiated from the instant case. There as here claim was made for damages to be incurred in the future for medical attention and hospital services. There no proof was made as to the reasonableness of any charges for medical attention, either past or future. Here there was proof of the amount and its reasonableness of every item expended prior to the trial. Also here, as we believe, there was all the proof susceptible to the nature of the case made as to damages to be suffered in the future. The evidence given was the very best evidence susceptible of being shown, which satisfied the rule of law as to proof of such damages. The charge in the Phoebe Jackson case told the jury that "any amount" which the plaintiff had expended and will likely have to expend might be taken into consideration in fixing the amount of the damages. The court very properly disapproved this charge. It said, "What was included for 'medicines and medical treatment,' past or future, or both, is of course unknown, and on the record it is unascertainable. For lack of proof in respect to the reasonable value or cost involved in those items, the jury should not have been allowed to consider them." As seen, there was no proof of the reasonableness

of the charges which had already accrued, while here there was full proof. The case, in our opinion, on the facts, does not support appellant's contention.

By its fifth proposition appellant urges that the judgment should be reversed because of misconduct of the jury. The substance of the complaint is that while the jury was considering special issue No. 11, which related to the damages sustained by Martha Wood, the injured girl, the jurors improperly discussed and considered the attorney fees which she would probably have to pay her attorneys for prosecuting the suit in her behalf, which matter was not before them in the evidence nor in the court's charge, and that it being reasonably doubtful as to whether such improper conduct of the jurors affected the amount of the verdict, the court erred in refusing to grant appellant a new trial. The record discloses that appellant procured and offered in evidence an affidavit of one of the jurors, and summoned that juror and one other as witnesses on the hearing of the motion for a new trial. Appellee summoned the other ten jurors. All twelve of the jurors were in attendance and testified.

Juror A. J. Buchanan, in substance, testified on direct examination that on the question of damages, the jurors were all split up, the lowest amount being $10,000 and the highest $30,000. That he was for $10,000. That some one of the jurors said to him that if "you gave her $10,000.00, she wouldn't get none of it; after you paid the attorney fees, she wouldn't have nothing left." That after that statement he agreed to give her $18,000. He was then asked:

"Q. Was your decision in agreeing to give $18,000.00 based on the statement made to you as to the attorneys receiving a portion of the award? A. Not altogether. We stayed in there and split from $30,000.00 down to that far.

"Q. Was it not partly based upon that statement? Was your decision to give her $18,000.00 partly based on the statement of that juror that the attorneys would get a part of the award? A. Yes, sir.

"Q. From the conversation that took place, how much attorney fees did you think Miss Wood's attorneys would get out of the judgment? A. I wouldn't know myself.

"Q. From the discussion that took place there? A. That was discussed from several angles. They didn't know just what. Some of them thought maybe they might get fifty percent and some twenty-five percent and some thirty percent. There wasn't no certain amount.

"Q. When you consented to give $18,-000.00, state whether or not that was done for the purpose of enabling Miss Wood to get a net of $18,000.00? A. That is right."

On cross-examination, he testified that he followed the court's charge; that he didn't consider anything but the evidence given on the witness stand; that he based his verdict solely on the court's charge and the evidence; that he didn't think he considered anything else; that he didn't consider anything outside of the evidence; that he wanted Miss Wood to get $10,000 and that he came up to $18,000 in order for her to do so; that he did not know who of the jurors first mentioned the attorney fees; that in coming up from $10,000 to $18,000 he took as his guide the charge of the court and the evidence, and that he didn't think he considered anything else.

The other eleven jurors were offered by appellee. Juror Cochran testified that he was foreman of the jury; that he thought the question of attorney fees was mentioned—it was not discussed, that if it had been he would have heard it and that he did not hear it. On cross-examination he testified that there were seven of the jurors that favored $30,000; some favored $20,000 and one $10,000; that the matter of attorney fees was not discussed generally, but the subject was mentioned; that he did not hear the statement that her attorneys would get from a fourth to one-half of what she got; that the jurors were told that they could not discuss that matter.

J. H. Goodson, juror, testified that he did not hear anything said about attorney fees; that if it had been mentioned he would have heard it. On cross-examination, he said attorney fees were mentioned, but that there was no argument with juror Buchanan that he ought to come up so that Miss Wood would get $10,000 after paying her attorneys; that they talked about it a little, but there wasn't any argument.

Juror R. L. Curd testified that the subject of attorney fees was mentioned, and he told the jurors that they could not discuss that and it was not mentioned any more; that he did not hear any of the jurors tell juror Buchanan that if they awarded Miss Wood $10,000 that her attorneys would get half of it and that he ought to come up so she could get more money. On cross-examination he testified that attorney fees were mentioned, but there was no general discussion; that "it was not discussed because two or three of us stopped it when it started."

Juror John Sallee testified that he did not hear attorney fees mentioned while they were discussing the case; that he believed he did hear juror Buchanan mention it, but that there was no general discussion of the matter, and that he did not hear attorney fees mentioned but the one time when Buchanan mentioned it. On cross-examination he testified that he did not hear any one tell Buchanan that he ought to raise his figures from $10,000 because if they did not she would not have much left after she paid her attorneys.

Juror Pete Novark testified that he heard attorney fees mentioned; that he did not hear any one say to Buchanan that if they only gave Miss Wood $10,000 after she paid her attorneys she would not have much left. On cross-examination he testified that he did not hear any such, and didn't think it was said.

Juror M. Patrick testified that attorney fees were mentioned once, but were not discussed. On cross-examination he testified that the jury were divided, some for $30,000 and down to $10,000; that juror Buchanan was for $10,000; that there was considerable discussion with Buchanan in an effort to get him to raise his estimate, but that he did not hear any one say to him that Miss Wood would not have much left after she paid her attorneys, if they gave her only $10,000; that there was no discussion of attorney fees; that he did not think that any one said the lawyers would get a part of her award.

Juror T. R. Sanders testified that he did not think anything was said about attorney fees, and if it was mentioned he did not pay any attention to it. On cross-examination he testified they (the other members of the jury) did not work "pretty hard" to get Buchanan to come up, saying: "Well, I don't believe anyone insisted on him very heavily." And in answer to the question: "But it was done by the others to try to get him to come up?", he said: "I don't think so." He said that he did not hear

it said that if they gave the girl only $10,000 that after paying her attorneys she would not have much left, he said: "Attorney fees wasn't mentioned that I remember of."

Juror R. D. Ellison testified that he did not hear anything said about Miss Wood would have to pay attorney fees. On cross-examination he testified that juror Buchanan favored awarding Miss Wood $10,000, and that some wanted to give her $30,000; that some of the jurors tried to get Buchanan to give her more than $10,000; that some one made the remark that after paying her lawyers she would not have much left, when some one said we shouldn't discuss that.

Juror C. H. Williams testified that something was said about attorney fees, but it was not discussed; that some one said we did not have the right to discuss attorney fees, and nothing more was said about it. On cross-examination he testified that he heard some one say to juror Buchanan that he ought to give Miss Wood more than $10,000 because the lawyers would get half of what she got, or "something like that;" that as near as he could remember that remark was made to Buchanan after they had arrived at their verdict; that after that everybody agreed on $18,000; on redirect, in answer to the question "How long after," he said "From sometime Sunday until Monday morning."

Juror A. H. Inglett testified that "Something was said about attorney fees that she would have to pay her lawyers and doctor bills and that was about the only thing that come up about the attorneys"; that some one said that we didn't have anything to say about that; and that he did not hear the matter mentioned after that; that the remark about the attorney fees was made before the jury arrived at its verdict.

Juror J. K. Hoke testified that the subject of attorney fees was "just casually mentioned." On cross-examination he testified that the matter of attorney fees was mentioned, and that he said, "I do not know anything about what they get," and some one said fifty or forty percent was customary, and that he expected that the jury thought, when they agreed on $18,000, that the attorneys would get half, or a big part of it; that he thought that one of the reasons why he agreed to the $18,000; that the talk about attorney fees was before they had agreed on the verdict. He

(Hoke) at first voted to give Miss Wood $20,000; this was before they agreed on $18,000.

There is in the record a complete statement of facts adduced on the hearing of the motion for a new trial. We have given what we deemed the substance of each juror's testimony that was material.

It is seen that there is a substantial conflict in the testimony of the jury as to what occurred relating to discussing attorney fees. Answering special issue No. 11 (what amount of damages should be given to Miss Wood) was the chief cause of delay in returning the verdict. We think the record shows that if the attorney fees question was discussed, that juror Buchanan was the member that broached the matter. He also was the juror who made the affidavit upon which the question of misconduct of the jury was based. While he says that some one stated to him that if the jury gave the injured party only $10,000 that she would not have much left after paying her attorneys, and that as he wanted her to have that amount net, that by reason of the attorney fees question, he came up to $18,000, he also stated that he did not do so "altogether for that reason"; that he followed the court's charge; that he didn't consider anything but the evidence given on the stand; that he didn't consider anything outside of the evidence; that he based his verdict solely on the court's charge and the evidence. In view of these statements made under oath, he rendered very doubtful the weight to be given to his evidence.

The other jurors who remembered that the subject of attorney fees was mentioned, all say that there was no general discussion of the matter, but that its mention was casual, and that the jurors were told that they should not discuss the matter, and that it was not mentioned again. Whether there was such misconduct of the jury as would likely affect their verdict was a question of fact. In passing upon this question the court has the same latitude in determining the credibility of witnesses and the weight to be given their testimony as the jury had upon the trial. Its duty is to weigh all of the evidence of the witnesses who testified, and to consider it as a whole. If there are inconsistencies or contradictions in the testimony of a witness it rests within the sound discretion of the court to harmonize and reconcile them as far as possible. The

court may disbelieve the testimony of a witness who stands impeached as to material matters, or who has violated his oath by returning a verdict which he believed to be false, or whose testimony is so uncertain, contradictory and confusing as to render its merit uncertain. It has been said that the testimony of jurors who seek to stultify themselves, or reflect upon the conduct of their fellows, should always be scrutinized with great caution, if not suspicion, and should never be resolved against their verdict regularly returned, except in clear cases of abuse and injury to the complaining party. Where the evidence as to whether alleged misconduct actually occurred is conflicting, it is the province of the judge to determine the issue of fact, and his determination should not be disturbed except when it is palpably wrong, and on appeal from an order made on the motion for a new trial based upon alleged misconduct of the jury, the appellate court will take the most favorable view of the evidence that the trial court was authorized to take. 31 Tex.Jur. 166, Sec. 154; Monkey Grip Rubber Co. v. Walton, 122 Tex. 185, 53 S.W.2d 770; Dallas Ry. & Terminal Co. v. Horton, Tex.Civ.App., 119 S.W.2d 122, writ dismissed; Bradshaw v. Abrams, Tex.Com.App., 24 S.W. 2d 372; El Paso Electric Co. v. Prince, Tex.Civ.App., 95 S.W.2d 147, writ dismissed; State Teachers' Mutual Life Ins. Co. v. Mims, Tex.Civ.App., 74 S.W.2d 549, writ refused; Texas & Pacific Ry. Co. v. Aaron, Tex.Civ.App., 19 S.W.2d 930, writ refused. The last cited case is on the facts very similar to the instant case. There the juror who said attorney fees were discussed was the one who, if any one, mentioned the subject. It was so in the instant case. There the juror who said he was influenced by the discussion of attorney fees voted at first for $10,000, the others were five for $25,000 and six for $20,000. They rendered a verdict for $20,000. Here the juror Buchanan first voted for $10,-000 and finally for $18,000, the verdict returned. There when the subject of attorney fees was mentioned, the foreman promptly told the jurors that they could not consider or discuss that subject, and that the matter was not again mentioned. So, here it is definitely shown that the jurors were told they could not consider attorney fees, and there was no further mention of the matter. In that case the jurors for more than $20,000 came down to $20,000 and the juror for $10,000 came up to $20,000 to get a verdict. Here the jurors (all of them but Buchanan) were for from $20,000 to $30,000, and they came down to $18,000 and Buchanan came up to $18,000 to get a verdict. The one juror in the cited case said the question of attorney fees influenced him to go up in his amount, here Buchanan testified both ways on that question. In the cited case the court heard the evidence on the question of misconduct, and overruled the motion for a new trial, and the Supreme Court refused a writ of error, and the United States Supreme Court (281 U.S. 756, 50 S.Ct. 409, 74 L.Ed. 1166) refused certiorari. Many authorities could be cited supporting the rule.

Apparently appellant relies to some extent upon the testimony of the juror Hoke as supporting its contention that attorney fees were discussed by the jury before arriving at its verdict, and that such discussion influenced him in arriving at the verdict. Hoke did testify that attorney fees were mentioned, and that he thought one of the reasons why he voted for the verdict of $18,000 was the mention of attorney fees. That such was the fact is on its face impossible. According to his own testimony, on the first ballot he voted for $20,-000 before he finally voted for the $18,000 verdict. He went down instead of up in his estimate of what damages should be given. The assignment is overruled.

We have discussed all the assignments of error presented by appellant, and finding no reversible error, the judgment should be affirmed, and it is so ordered.

Affirmed.